ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE PRIMERA INSTANCIA
SALA SUPERIOR DE SAN JUAN

| | |
|---|---|
| **JOSÉ G. NÁTER OCASIO**<br><br>Querellante<br><br>v.<br><br>**X-SQUARE CAPITAL, LLC**<br><br>Querellada | CIVIL NÚM. KPE2016-1288<br><br>SOBRE: 906<br><br>**DESPIDO INJUSTIFICADO**<br>(Ley 80 de 30 mayo de 1976, según enmedanda y la jurisprudencia aplicable)<br><br>**REPRESALIAS Y DAÑOS**<br>(Ley 115 de 20 de diciembre de 1991, según enmendada y la jurisprudencia aplicable)<br><br>**INCUMPLIMIENTO DE CONTRATO DE EMPLEO,** incluyendo salarios devengados y no pagados, bono por desempeño no pagado y vacaciones acumuladas, no disfrutadas y no liquidadas)<br>(Arts. 1044 y 1210 del Código Civil, jurisprudencia aplicable e interpretaciones)<br><br>**DAÑOS Y PERJUICIOS POR INCUMPLIMIENTO DE CONTRATO DE EMPLEO**<br>(Art. 1054 del Código Civi y la jurisprudencia aplicable)<br><br>**PROCEDIMIENTO SUMARIO**<br>(Ley 2 de 17 de octubre de 1961, según enmendada y la jurisprudencia aplicable) |

**QUERELLA**

**AL HONORABLE TRIBUNAL:**

Comparece, **JOSÉ G. NÁTER OCASIO** (en adelante, el querellante), por conducto de su representación legal que suscribe, y muy respetuosamente expone, alega y solicita:

1. El querellante de epígrafe es mayor de edad y soltero. Su dirección residencial y postal es la siguiente: Ciudad Jardín III, 383 Calle Casia, Toa Alta PR 00953. Su número de teléfono es el siguiente: (787) 923-3846.

2. X-Square Capital LLC (en adelante, X-Square), es una corporación doméstica, con fines de lucro y de responsabilidad limitada, debidamente incorporada y registrada en el Departamento de Estado de Puerto Rico; y debidamente registrada como Compañía de Inversión en la Oficina del Comisionado de Instituciones Financieras de Puerto Rico y en la *US Securities & Exchange Commission*. Ésta cuenta con capacidad jurídica para demandar y ser demandada. Además, al momento de los hechos a ser

alegados más adelante, era el patrono del querellante. La dirección física y postal de X-Square es Edif. Popular Center, 209 Ave Ponce de León, Ste 1111, San Juan PR 00918-1000; siendo su número de teléfono 787-282-1621.

3. Ignacio M. Canto (en adelante, Canto), Presidente y Principal Accionista de X-Square desde enero de 2013 hasta el presente, fue el Tesorero del Banco Gubernamental de Fomento para Puerto Rico (en adelante, el Banco), desde septiembre de 2010 hasta diciembre de 2012.

4. En marzo de 2011, Canto contrató al querellante como empleado del Banco, en la posición de Asesor en Inversiones *("Head Trader")*; devengando un salario anual de $90,000.00. En su evaluación de desempeño anual (1ro de enero al 31 de diciembre de 2011), realizada por Canto, éste obtuvo una puntuación de 4.59/5.00 (excepcional - sobrepasó significativamente los requisitos del puesto).

5. Efectivo, el 15 de noviembre de 2011, el querellante fue promovido por Canto a la posición de confianza *"Assistant Treasurer - Head Trader"*; devengando un salario base anual de $125,000.00. En su próxima evaluación de desempeño anual (1ro de enero al 31 de diciembre de 2012), también realizada por Canto, éste obtuvo una puntuación de 4.95/5.00 (excepcional - sobrepasó significativamente los requisitos del puesto).

6. Desde antes de trabajar juntos en el Banco, Canto y el querellante, quienes se conocieron mientras estudiaban en el Colegio San Ignacio de San Juan, venían discutiendo la idea de "montar" una Compañía de Inversión. Las conversaciones sobre el tema se intensificaron y discutieron por varios meses, mientras éstos trabajaron para el Banco. Toda vez que, efectivo al 31 de diciembre de 2012, Canto dimitiría a su puesto de confianza como Tesorero del Banco, debido al cambio de Administración en el Gobierno, éste comenzó a realizar las gestiones para "montar" dicha Compañía; incluso, solicitó una consulta a la Oficina de Ética Gubernamental de Puerto Rico, al respecto. Así las cosas, Canto le ofreció al querellante participación y trabajo en la Compañía de Inversión a punto de crearse.

7. A tales efectos, el 14 de diciembre de 2012, el querellante presentó su renuncia al puesto de *"Assistant Treasure - Head Trader"* en el Banco, efectivo al 31 de diciembre de 2012.

8. No obstante, la Administración del Banco le solicitó al querellante quedarse unos meses adicionales para asegurar una transición adecuada con el Tesorero entrante. Dicha petición fue discutida por el querellante con Canto. Ambos decidieron el querellante permanecería trabajando para el Banco hasta, el 28 de junio de 2013; incorporándose a X-Square, el 1ro de julio de 2013, fecha en la que se esperaba la estructura de la nueva Compañía de Inversión estaría lista.

9. En marzo de 2013, el Presidente del Banco le ofreció al querellante ocupar el puesto de Tesorero; sin embargo, por los compromisos previos entre Canto y éste, el querellante le indicó al Presidente del Banco no poder aceptar la oferta.

10. El 1ro de julio de 2013, el querellante se incorporó a X-Square; pensando, en todo momento, tendría participación en la Compañía.

11. No obstante, y para sorpresa del querellante, varias semanas más tarde Canto le extendió un Contrato de Empleo *("Employment Agreement")* con X-Square, por tiempo indeterminado, para ocupar la posición de *"Senior Vice President & Portfolio Manager"*; efectivo, el 7 de agosto de 2013.

12. Dado la realidad del querellante en ese momento, éste no tuvo más alternativa que proceder a firmar el referido Contrato; el 31 de julio de 2013. Es importante señalar, que del querellante haber sabido de dicho Contrato de Empleo antes de finalizar su relación de empleo con el Banco y por ende, de las intenciones de Canto de que éste fuera empleado de X-Square y no accionista, no hubiese rechazado la oferta que le fuera extendida por el Presidente del Banco para ocupar el puesto de Tesorero.

13. Desde el 1ro de julio al 6 de agosto de 2013, el querellante trabajó para X-Square, sin contrato escrito y sin devengar ingresos mensuales por concepto de salarios.

14. Aún después del otorgamiento del Contrato de Empleo entre X-Square y el querellante, desde el 7 de agosto al 31 de diciembre de 2013, el querellante tampoco devengó ingresos mensuales por concepto de salarios.

15. La primera vez que el querellante recibió paga por su trabajo en X-Square, por concepto de salarios mensuales, fue el 30 de enero de 2014; pero ni siquiera se acercó al salario mínimo mensual acordado en el Contrato de Empleo ($80,000.00 anuales, equivalentes a $6,666.67 mensuales); sino una suma relativamente menor.

16. El querellante estuvo trabajando para X-Square, devengando un salario mensual inferior al mínimo pactado, hasta el 1ro de agosto de 2014; fecha, en la que, por vez primera durante su empleo con X-Square, devengó un salario mensual dentro de la

escala salarial anual establecida en el Contrato de Empleo en cuestión. Dicho salario correspondió al mes de julio de 2014.

17. Así las cosas, el querellante continuó ejerciendo eficientemente todas y cada una de las funciones de su puesto como *"Senior Vice President & Portfolio Manager";* sin recibir cuestionamiento alguno o queja en cuanto a su desempeño.

18. Aproximadamente, a mediados del año 2015, Canto y el querellante tuvieron diferencias de criterio sobre algunas transacciones. Cabe señalar, que aunque en ciertas ocasiones éstos no estuvieron de acuerdo, las conversaciones entre ellos siempre fueron profesionales y respetuosas. Sin embargo, cada vez que el querellante presentaba su punto de vista y análisis sobre una transacción particular, Canto tomaba la decisión final sin considerar las recomendaciones del querellante.

19. Durante este período, la comunicación entre Canto y el querellante comenzó a deteriorarse. En varias ocasiones, el querellante intentó explicarle su punto de vista y análisis sobre una transacción en particular, pero Canto lo descartaba de inmediato. Incluso, en algún momento del verano de 2015, el querellante intentó dialogar con Canto sobre la venta de unos bonos, pero éste se mostró renuente a escuchar.

20. A tales efectos, a finales del mes de julio de 2015, mientras caminaban hacia el estacionamiento del lugar donde ubica X-Square, el querellante le manifestó a Canto la necesidad de mejorar la comunicación entre ellos. El querellante le expresó a Canto no entender por qué cada vez que trataba de presentarle una idea, éste decidía cerrar los canales de comunicación de inmediato. Incluso, el querellante le mencionó varios ejemplos de situaciones específicas en las cuales Canto no estuvo dispuesto a escuchar su análisis.

21. Después de varios minutos de conversación, Canto y el querellante decidieron trabajar para mejorar cualquier problema de comunicación entre ellos. Incluso, Canto le pidió al querellante que, de mostrarse nuevamente renuente a escucharlo, se lo dejara saber. Esa misma noche, Canto le envió un mensaje de texto al querellante dándole las gracias por la iniciativa de dialogar sobre el asunto; recordándole, que de volver a suceder, se lo dejara saber.

22. Sin embargo, unas semanas más tarde, específicamente, el 24 de agosto de 2015, Manuel Moreda (en adelante, Moreda), también empleado de X-Square, le envió un correo electrónico al querellante indicándole, desde ese momento se estaría reportando a él; en lugar de al Presidente (Canto).

23. El referido correo electrónico causó gran sorpresa al querellante, tanto por la decisión *per se*, como por la persona y manera en la que se le comunicó; incluso, después de la reciente conversación entre Canto y el querellante. Además, porque el querellante entendía que Moreda – quien, al igual que éste, comenzó a trabajar para X-Square, en junio de 2013 – ocupaba una posición igual y a su mismo nivel. Inclusive, una queja constante de Canto era el serio problema de ausencias y tardanzas de Moreda. Canto hasta le pidió al querellante no realizar viajes o tomar vacaciones al mismo tiempo que él; pues le preocupaba que de ellos no estar en la Compañía, Moreda no se presentara a trabajar.

24. A tales efectos, el querellante procedió a enviarle un correo electrónico a Canto, quien se encontraba en New York, dejándole saber quería hablar con él sobre la decisión comunicada por Moreda. La respuesta de Canto fue, básicamente, dejarle saber al querellante no tener reparo en hablar, pero que la decisión ya estaba tomada.

25. Varios días más tarde, X-Square le entregó al querellante, por vez primera: 1) *"Job Description"* de su posición como *"Senior Vice President & Portfolio Manager"*, ahora reportándose a Moreda, *"Executive Vice President"*; 2) Manual del Empleado (Revisado 8/24/2015; 34 págs.). De igual modo, X-Square procedió a revisar el Contrato de Empleo del querellante; otorgando un nuevo Contrato de Empleo por tiempo indeterminado, fechado 8 de septiembre de 2015 y firmado por el querellante, el 14 de septiembre de 2015.

26. En virtud del Contrato de Empleo revisado, varias de las condiciones de empleo del querellante fueron modificadas; especialmente, las relacionadas con su compensación salarial, ahora sujetas a requisitos diferentes y más difíciles de lograr, para devengar el tope más alto en la escala salarial ($149,900.00).

27. Así las cosas, el querellante no tuvo más alternativa que ajustarse a las decisiones arbitrarias, caprichosas y unilaterales tomadas por X-Square; y continuó desempeñando las funciones de su puesto eficientemente.

28. El 29 de octubre de 2015, Moreda no se presentó a tiempo a X-Square. Cerca de las 9:20 de la mañana, Canto manifestó: "Parece que Manuel decidió tomarse la mañana libre". Canto intentó iniciar (*"log in"*) en la computadora de Moreda para acceder *"JETS"* (plataforma utilizada para ejecutar transacciones) y poder ejecutar las transacciones discutidas en la reunión del día anterior; pero no tuvo éxito. A tales efectos,

tuvo que descargar el referido programa *("JETS")*, en su computadora para llevar a cabo las transacciones en cuestión.

29. Aproximadamente, a las 9:40 de la mañana, Gabriel Medina (en adelante, Medina), *"Chief Compliance Officer"*, preguntó por Moreda; a lo que Canto respondió, entre otros detalles, que parecía éste se iba a levantar a las 11:00 de la mañana. Canto manifestó que, en esta ocasión, parte del bono por desempeño de Moreda sí se vería afectado y que "Manuel no [era] *reliable*". Lo anterior, porque no era la primera vez que esto sucedía.

30. Ese mismo día, el Sr. Alton Jones, de Jefferies (Firma Global de Banca de Inversión y Valores, con sede en New York), llamó a X-Square para informar de un error cometido por Moreda al comprar y vender las mismas opciones financieras.

31. El 9 de noviembre de 2015, después de almorzar, el querellante notó que habían utilizado su computadora en X-Square. Al preguntarle a Moreda, éste le indicó que tuvo que hacer unos cambios de seguridad a la computadora y que en el proceso, tuvo que hacer un *"forced shutdown"*; por lo que cualquier documento abierto no guardado, probablemente se había borrado. "Mala mía", fue lo último que le dijo Moreda al querellante.

32. Esa mañana, antes de irse a almorzar, el querellante había estado trabajando con el *"Commonwealth Report"* y la Ley de *"Chapter 9"*. Por la intervención de Moreda en la computadora del querellante, todas sus notas de los trabajos antes mencionados, se perdieron.

33. Al día siguiente (10 de noviembre de 2015), cuando el querellante llegó a X-Square, su computadora se encontraba encendida; aún cuando éste la había apagado antes de irse el día anterior. Intentó acceder a su correo electrónico y no pudo.

34. Poco tiempo más tarde (10 de noviembre de 2015), Canto llegó con Moreda y le indicó al querellante se tenían que reunir. Canto procedió a informarle al querellante, que desde ese momento, no trabajaba para X-Square. El querellante le preguntó la razón de la decisión y Canto le contestó no tener que decirle nada.

35. Acto seguido (10 de noviembre de 2015), Canto le entregó al querellante un sobre, que contenía: 1) *"Settlement and Release Agreement"*, por la suma de $21,540.00 como *"Severance Payment"* y $300.00 por concepto de Bono de Navidad; 2) Cheque por la suma de $2,064.83, por concepto de salarios devengados durante noviembre de 2015; 3) Cheque por la suma de $6,257.06 por concepto de vacaciones acumuladas y no utilizadas.

36. Canto le manifestó al querellante (10 de noviembre de 2015), tenía siete (7) días para firmar el "*Settlement and Release Agreement*"; y que una vez lo firmara, le haría llegar las sumas mencionadas en el documento. Moreda aprovechó para expresarle al querellante que el cheque por tales conceptos estaba listo para serle entregado; y si lo firmaba en ese momento, "no le iban a hacer nada".

37. El 13 de noviembre de 2015, el querellante procedió a depositar en su cuenta bancaria, los dos (2) cheques entregados por Canto, el 10 de noviembre de 2015. No obstante, el 16 de noviembre de 2015, el Banco del querellante le informó que el cheque de vacaciones por la suma de $6,257.06 había sido suspendido (CDD Suspensión Pago - Cheque Depositado Devuelto).

38. Al día siguiente (17 de noviembre de 2015), Canto le envió un correo electrónico al querellante comunicándole que el plazo de siete (7) días para firmar el "*Settlement and Release Agreement*", expiraba ese día, a las 4:00 de la tarde.

39. En igual fecha, pero en otro correo electrónico, Canto le informó al querellante su cheque por concepto de vacaciones sería cancelado por no haber firmado el "*Settlement and Release Agreement*"; esto, a pesar de dicho cheque haber sido cancelado desde el día anterior.

40. Por razones que son del total conocimiento de X-Square y su Presidente, el querellante optó por no firmar el "*Settlement and Release Agreement*".

41. El 7 de diciembre de 2015, Canto le envió un correo electrónico al querellante, acompañando un documento intitulado, "*Termination and Release Agreement*". En el mismo, X-Square le ofreció al querellante $37,849.23; suma mayor a la ofrecida en el "*Settlement and Release Agreement*" antes mencionado, a cambio de su firma, en un plazo de siete (7) días.

42. Por razones que son del total conocimiento de X-Square y su Presidente, el querellando tampoco firmó el "*Termination and Release Agreement*".

**PRIMERA CAUSA DE ACCIÓN**
**DESPIDO INJUSTIFICADO**
**(Ley Núm. 80 de 30 de mayo de 1976, según enmendada**
**y la jurisprudencia aplicable)**

43. Durante su empleo con X-Square, el querellante siempre realizó, cabal y eficientemente, todas y cada una de las funciones de su puesto como "*Senior Vice President & Portfolio Manager*"; sin recibir cuestionamiento alguno o queja en cuanto a su desempeño. Éste nunca fue amonestado; muchos menos suspendido de empleo y sueldo.

44. Por lo tanto, el despido del querellante, totalmente arbitrario y caprichoso, fue injustificado; por lo que, conforme la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, X-Square viene obligada a compensarlo con la indemnización estatutaria correspondiente.

45. El Artículo 1 de la Ley Núm. 80, *supra*, en su parte pertinente, dispone:

> "Todo empleado de comercio, industria o cualquier otro negocio o sitio de empleo, designado en lo sucesivo como el establecimiento, donde trabaja mediante remuneración de alguna clase contratado sin tiempo determinado, que fuere despedido de su cargo sin que haya mediado una justa causa, tendrá derecho a recibir de su patrono, además del sueldo que hubiere devengado:
>
> (a) el sueldo correspondiente a dos meses por concepto de indemnización, si el despido ocurre dentro de los primeros cinco (5) años de servicio; el sueldo correspondiente a tres (3) meses si el despido ocurre luego de los cinco (5) años hasta los quince (15) años de servicio; el sueldo correspondiente a seis (6) meses si el despido ocurre luego de los quince (15) años de servicio;
>
> (b) una indemnización progresiva adicional equivalente a una (1) semana por cada año de servicio, si el despido ocurre dentro de los primeros cinco (5) años de servicio; dos (2) semanas por cada año de servicio, si el despido ocurre luego de los cinco (5) años hasta los quince (15) años de servicio; tres (3) semanas por cada año de servicio, luego de haber completado quince (15) años o más de servicio".

46. Por su parte, el Artículo 4 de la referida Ley, dispone que la indemnización establecida en el Artículo antes mencionado, será pagado "tomando como base el tipo de salario más alto devengado por el empleado dentro de los tres (3) años inmediatamente anteriores al momento de su despido".

47. Según la *Guía para la Interpretación y Aplicación de la Ley Núm. 80 de 30 de mayo de 1976, según enmendada*, revisada por el Departamento del Trabajo y Recursos Humanos, el 30 de junio de 2014, haciendo referencia a Beauchamp v. Holsum Bakers of P.R., 116 DPR 522 (1985), "[l]a Ley al referirse al "tipo de salario más alto" se refiere a *todo tipo* de remuneración devengada por el empleado por sus servicios..." (énfasis suplido); incluyendo, bonos por desempeño *("performance bonuses")* que no dependen exclusivamente de la discreción del patrono (aunque, se denominen como discrecionales).

48. El tipo de salario más alto devengado por el querellante durante los dos años y medio que laboró como empleado de X-Square, fue de $218,940.00 anual (por diez (10) meses y diez (10) días trabajados); según su Comprobante de Retención sobre Ingresos (W2) del año 2015; equivalentes a $20,931.17 mensual y $4,880.52 semanal.

49. A tales efectos, la indemnización a la que el querellante tiene derecho y X-Square viene obligada a satisfacer, asciende a una suma no menor de $52,026.34.

50. Dicha indemnización podría resultar en una suma mayor, en la medida en que se demuestre el querellante debió devengar ingresos mayores a los reportados, según los Contratos de Empleo otorgados entre éste y X-Square; lo que será discutido más adelante.

## SEGUNDA CAUSA DE ACCIÓN
## REPRESALIAS Y DAÑOS
(Ley Núm. 115 de 20 de diciembre de 1991, según enmendada
y la jurisprudencia aplicable)

51. El despido del querellante fue como consecuencia directa e inmediata de las expresiones que éste le hizo a Canto, Presidente de X-Square, referentes a los problemas de comunicación entre ambos y al requerimiento de que tomara en cuenta sus recomendaciones y puntos de vista. Canto, a pesar de manifestarle "agradecimiento" por el acercamiento e indicarle que trabajaría para que no sucediera nuevamente, vejó y humilló al querellante al decidir ya éste no se reportaría directamente a él; sino a otro empleado que estaba prácticamente a su mismo nivel y de quien, hasta incluso, Canto se quejaba con regularidad.

52. De igual modo, el despido del querellante fue como consecuencia directa e inmediata de las expresiones que éste le hizo a Canto, al enterarse de la decisión de ponerlo a reportarse a Moreda. Éste último se encargó de conspirar en contra del querellante, hasta interfiriendo sospechosamente con su computadora de trabajo, para que X-Square lo despidiera.

53. Por lo tanto, el despido del querellante, además de injustificado, fue en represalias; pues éste fue despedido inmediatamente después de haber participado en una actividad protegida por la Ley Núm. 115 de 20 de diciembre de 1991, según enmendada.

54. A tales efectos, conforme la referida Ley Núm. 115, X-Square viene obligada a restituirlo en su empleo y pagarle los salarios y beneficios dejados de devengar, desde la fecha del despido hasta el momento en que sea efectiva la restitución. Tales ingresos y beneficios dejados de devengar se estiman, al presente, en una suma no menor de $50,000.00; suma que irá en aumento hasta que el querellante sea restituido en su empleo.

55. Además, por motivo de su despido en represalias, el querellante ha sufrido y continúa sufriendo daños reales y angustias mentales, los cuales se estiman en una suma no menor de $50,000.00.

56. En virtud de la referida Ley Núm. 115, el querellante solicita el doble de la cuantía por concepto de daños y salarios dejados de devengar.

**TERCERA CAUSA DE ACCIÓN**
**INCUMPLIMIENTO DE CONTRATO DE EMPLEO**
(Salarios devengados y no pagados; bono por desempeño no pagado;
y vacaciones acumuladas, no disfrutadas y no liquidadas)
(Artículos 1044 y 1210 del Código Civil,
jurisprudencia aplicable e interpretaciones)

57. Es sabido que la legislación protectora del trabajo cristaliza la política pública del Estado sobre los derechos, beneficios y condiciones mínimas de trabajo que han de disfrutar los empleados en Puerto Rico. Esto, no constituye un obstáculo ni menoscaba la oportunidad del empleado de obtener mejores condiciones de trabajo mediante la contratación individual. Lo anterior, porque lo que no está permitido por el ordenamiento jurídico es que un empleado contrate con su patrono condiciones de trabajo inferiores a las mínimas establecidas en la legislación protectora del trabajo; y que, cualquier disposición contractual con tal alcance es nula e ineficaz en derecho por ser contraria a la ley, a la moral y al orden público. Véase, Freire Ayala v. Vista Rent To Own, Inc., 2006 TSPR 162.

### Salarios devengados y no pagados

58. El querellante comenzó a trabajar para X-Square, sin contrato escrito, el 1ro de julio de 2013.

59. El querellante no devengó salarios mensuales por su trabajo con X-Square, durante los meses que estuvo sin contrato escrito; del 1ro de julio al 7 de agosto de 2013.

60. Por el querellante ser un empleado profesional exento por definición, le son de aplicación las diposiciones de la Quinta Revisión del Reglamento Núm. 13, adoptado por el Departamento del Trabajo y Recursos Humanos de Puerto Rico en el año 2005, de conformidad con la Sección 13(a)(1) de la Ley de Normas Razonables de Trabajo (FLSA, por sus siglas en ingles), según definidas en los Reglamentos, 29 CFR, Parte 541.

61. Dicho Reglamento requiere que el empleado profesional exento reciba una compensación, a base de salarios u honorarios, no menor de **$455.00 semanales;** excluyendo el pago de alimentos, facilidades de vivienda u otros servicios.

62. A tales efectos, X-Square adeuda al querellante una suma no menor de $2,457.00, correspondiente a las semanas trabajadas y no pagadas, desde el 1ro de julio al 7 de agosto de 2013.

63. El 31 de julio de 2013, se otorgó el primer Contrato de Empleo entre X-Square y el querellante; efectivo, el 7 de agosto de 2013.

64. La cláusula cuatro (4) del referido Contrato de Empleo (31 de julio de 2013), dispone:

> "4. Salary: X-Square will pay to you <u>a gross annual salary of between $80,000 - $149,900</u> subject to the amount of net assets under management, more specifically <u>a net AUM amount equal or in excess of $45,000,000 will warrant the upper band, which will be payable monthly, in arrears.</u> A lesser AUM level cannot warrant any compensation". (Énfasis suplido).

65. Según la cláusula que antecede, se estableció una escala salarial anual de entre $80,000.00 a $149,900.00, como salario a ser devengado por el querellante; a ser pagado mensualmente. Como mínimo, el querellante devengaría un salario anual de $80,000.00. Sin embargo, del "AUM" neto de X-SQUARE ser igual o mayor a $45,000,000.00, el querellante sería compensado con la escala salarial más alta; o sea, $149,900.00. **La disposición *"A lesser AUM level cannot warrant any compensation"* se tiene por no puesta; por ser contraria a derecho y por tanto nula.**

66. Desde que se otorgó el primer Contrato de Empleo entre X-Square y el querellante, éste no recibió salario mensual por su trabajo; sino, hasta el mes de enero de 2014.

67. A tales efectos, como mínimo, X-Square le adeuda al querellante una suma no menor de $32,146.40, por los meses de agosto a diciembre de 2013. No obstante, en caso del "AUM" neto de X-Square haber sido igual o en exceso de $45,000,000.00 para dicho período, X-Square le adeuda al querellante la suma de $60,231.12.

68. En enero de 2014, fue cuando X-Square, por vez primera, le hizo un pago al querellante por concepto de salario mensual. Desde ese momento hasta su despido, el querellante nunca recibió talonarios de pago por parte de X-Square; por lo que desconoce[1] los descuentos, si alguno, a los que su salario estuvo sujeto.

69. El método utilizado por X-Square para pagar el salario mensual del querellante fue, mediante depósitos de cantidades mensuales netas a su cuenta bancaria. El querellante no conoce a ciencia cierta, la cantidad bruta mensual devengada por concepto de salarios.

70. De enero a junio de 2014, el querellante recibió un salario mensual menor al mínimo establecido en el Contrato de Empleo (31 de julio de 2013). A tales efectos, como mínimo, X-Square le adeuda al querellante una suma no menor de $18,800.02, por la diferencia entre el salario mínimo pactado y el salario pagado. No obstante, en caso del "AUM" neto de X-Square haber sido igual o en exceso de $45,000,000.00 para dicho período, X-Square le adeuda al querellante la suma de $52,496.00.

---

[1] Excepto por la información que surge de los Comprobantes de Retención de Ingresos (W2's).

71. Tales sumas podrían variar, una vez X-Square evidencie los descuentos realizados a los salarios mensuales devengados por el querellante y el "AUM" neto de X-Square durante dicho período.

72. De julio de 2014 al 13 de septiembre de 2015, el querellante recibió un salario mensual dentro de la escala salarial estipulada en el Contrato de Empleo (31 de julio de 2013). No obstante, en caso del "AUM" neto de X-Square haber sido igual o en exceso de $45,000,000.00 para dicho período, X-Square le adeuda al querellante la suma de $65,129.22.

73. Dicha suma podría variar, una vez X-Square evidencie los descuentos realizados a los salarios mensuales devengados por el querellante y el "AUM" neto de X-Square durante dicho período.

74. Efectivo, el 14 de septiembre de 2015, X-Square revisó el Contrato de Empleo del querellante; modificando los términos relativos a su compensación salarial anual.

75. La cláusula cuatro (4) del referido Contrato de Empleo (14 de septiembre de 2015), dispone:

> "4. **Salary:** X-SQUARE will pay to you <u>a gross annual salary of $96,000, payable monthly</u>, in arrears, <u>which shall be increased to $149,900 subject to the X2 Alternative Dividend Alpha Fund, Inc. (the "LOCAL FUND") having an amount of net assets under management ("AUM") equal to or in excess of $45,000,000.</u> In addition to said conditional salary increase, and other discretionary salary reviews, if any, you will be entitled to an additional salary increase in the amount of 5% of your gross annual salary for each $100,000,000 increase in AUM's, in aggregate, between the LOCAL FUND and the proposed Pluscios X2 Global Macro Fund, LLC (the "GLOBAL FUND"), exclusive of the initial $45,000,000 in AUM of the LOCAL FUND. The AUM based salary increased formula will be determined on an annual basis, in an amount equal to the corresponding 5% increase in gross salary, for each $100,000,000 decrease in AUMs, in aggregate, between the LOCAL FUND and the GLOBAL FUND. For clarification purposes, such reversals, if any, will not be applied retroactively and will be applied to your salary exclusively on a forward basis". (Énfasis suplido).

76. Según la cláusula que antecede, se estableció un salario anual de $96,000.00; el cual, podría aumentar a $149,900.00, siempre y cuando el *"X2 Alternative Dividend Alpha Fund, Inc. (the LOCAL FUND)"*, tenga un "AUM" neto igual o en exceso de $45,000,000.00; entre otras disposiciones.

77. Desde el otorgamiento de dicho Contrato (14 de septiembre de 2015) hasta su despido, el querellante recibió el salario mensual mínimo estipulado en el mismo. No obstante, en caso del "AUM" neto del *"LOCAL FUND"* haber sido igual o en exceso de $45,000,000.00 para dicho período, X-Square le adeuda al querellante la suma de $8,204.34.

78. Dicha suma podría variar, una vez X-Square evidencie los descuentos realizados a los salarios mensuales devengados por el querellante y el "AUM" neto del *"LOCAL FUND"* durante dicho período.

### Bono por desempeño no pagado

79. La cláusula siete (7) de cada uno de los Contratos de Empleo otorgados entre X-Square y el querellante, en su parte pertinente, dispone:

> "7. <u>Bonuses</u>: Based on your performnace, you may be eligible to one or more bonuses during the year, at the discretion of the President. Any such bonus will be credited to any bonus required by law. [...]".

80. En virtud de la referida cláusula, y basado en el desempeño del querellante durante el 2014, el 22 de enero de 2015, éste recibió de X-Square un bono por desempeño (*"performance bonus"*), de $117,735.06 (neto).

81. Al día de hoy, el querellante no ha recibido su bono por desempeño correspondiente al año 2015, por lo que X-Square le adeduda el mismo; máxime, cuando se ha determinado que el pago de un bono que se hace en virtud de cualquier contrato, acuerdo o promesa, provocando que el empleado tenga una expectativa de que dicho bono se pagará, así como que dicho bono no depende de la sola discreción del patrono (pues, está atado al desempeño del empleado), se reputará como bono no discrecional.

### Vacaciones acumuladas, no disfrutadas y no liquidadas

82. La cláusula cinco (5) del Contrato de Empleo (31 de julio de 2013), dispone:

> "5. <u>Vacation and Sick Leave</u>: During the term of this employment agreement, you will be entitled to take eighteen 18 days of vacation and sick leave, proportionally accrued on a monthly basis, in accordance with the normal practices of X-SQUARE, in accordance to your position. Your vacation is to be taken at a time or times acceptable to X-SQUARE having regard to its operations. Unused leave can be carried over the next year only. If not used within 24 months of the accrual, same will be forfeited".

83. Por su parte, la cláusula cinco (5) del Contrato de Empleo (14 de septiembre de 2015), dispone:

> "5. <u>Vacation and Sick Leave</u>: During the term of this employment agreement, you will be entitled to take 20 days of vacation and 12 days of sick leave, proportionally accrued on a monthly basis, in accordance with the normal practices of X-SQUARE, in accordance to your position. Your vacation is to be taken at a time or times acceptable to X-SQUARE having regard to its operations. Sick Leave of more than 2 consecutive days must be justified via written medical evidence. Unused vacation leave can be carried over the next year only. If not used within 24 months of the accrual, same will be forfeited. Unused sick leave will remain accrued foe successive years up to a maximum of 15 days".

84. Al momento del despido del querellante, esté tenía acumulados no menos de veinte (20) días por concepto de vacaciones; los cuales no pudo utilizar, precisamente, por haber sido despedido. Por lo tanto, tiene derecho a que tales días de vacaciones acumulados le sean liquidados.

85. Así lo entendió, incluso, X-Square, al entregarle un cheque por la suma neta de $6,257.06 por tal concepto, al momento de despedir al querellante. Sin embargo, antes del querellante hacer efectivo el mismo, X-Square suspendió su pago, por motivo de éste no haber firmado el "*Settlement and Release Agreement*".

86. A tales efectos, X-Square le adeuda al querellante la suma de $8,000.00 por concepto de días de vacaciones acumulados no utilizados.

87. Dicha cantidad podría resultar en una suma mayor, en la medida en que se demuestre el querellante debió devengar ingresos mayores a los reportados.

### CUARTA CAUSA DE ACCIÓN
### DAÑOS Y PERJUICIOS
### POR INCUMPLIMIENTO DE CONTRATO DE EMPLEO
### (Artículo 1054 y jurisprudencia aplicable)

88. El Artículo 1054 del Código Civil, dispone, que cuando una parte contraviene los términos de un contrato, está sujeta a indemnizar los daños causados.

89. No obstante, para que proceda una acción de daños y perjuicios contractuales es necesario que haya mediado un acuerdo de voluntades generador de una obligación, situación o estado de derecho que haya creado unas expectativas a base de las cuales actuaron las partes.

90. Así, cada parte confía en que la otra cumplirá con lo libremente pactado, conforme al principio de la obligatoriedad de los contratos y de la buena fe. Una acción u omisión negligente o deliberada de una de las partes, que produzca el incumplimiento de la obligación contraída, dará origen a la causa de acción de daños y perjuicios *ex contractu*. Véase, Mattei Nazario v. Vélez & Asoc., 145 D.P.R. 508 (1998).

91. A tales efectos, el querellante reclama daños y perjuicios como consecuencia del incumplimiento de los contratos en cuestión; incumplimiento que le ha causado y le continúa causando extensas angustias y molestias. Tales daños se estiman en una suma no menor de $100,000.00.

92. El querellante se acoge, para el trámite de la presente acción, al procedimiento especial de carácter sumario que establece la Ley Núm. 2 de 17 de octubre de 1961, según enmendada[2].

---

[2] La Sec. 1 de la referida Ley, en su parte pertinente, dispone: "Siempre que un obrero <u>o empleado</u> tuviere que reclamar de su patrono cualquier derecho o beneficio, <u>o cualquier suma por concepto de compensación por trabajo o labor realizados para dicho patrono, o por compensación en caso de que dicho obrero o empleado hubiere sido despedido de su empleo sin causa justificada, podrá comparecer ante la Sala Superior del Tribunal de Primera Instancia, del lugar en que realizó el trabajo</u> o en que resida el obrero o empleado en la fecha de la reclamación y formular contra el patrono una querella en la cual se expresarán por el obrero o empleado los hechos en que se funda la reclamación". (Énfasis suplido).

**POR TODO LO CUAL** muy respetuosamente se solicita del Honorable Tribunal que, en su día y previo los trámites correspondientes, declare **CON LUGAR** la Querella de epígrafe y dicte Sentencia concediendo cada uno de los remedios solicitados; ordenando, además, a la querellada, satisfacer al querellante cada una de las partidas reclamadas; más las costas, gastos, intereses y el 25%, en concepto de honorarios de abogado.

**RESPETUOSAMENTE SOMETIDA.**

En Guaynabo, Puerto Rico, hoy 29 de abril de 2016.

La presente es una reclamación laboral exenta del pago de costas, por la sección 15 de la Ley Núm. 2 de 17 de octubre de 1961, según enmendada.

**PABLO R. ÁLVAREZ SEPÚLVEDA**
RÚA 7639
Colegiado 8963

**ANGELIK RODRÍGUEZ MALDONADO**
RÚA 14,725
Colegiado 16,113
101 Avenida San Patricio
Suite 910
Guaynabo PR 00968
Teléfonos: 787-998-1175/787-309-8092
Fax: 787-998-0775
alvarezp_lp@yahoo.com
lcda_arodriguez@hotmail.com